# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| CHRISTINA M. BRINKMAN,<br><br>   Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,[1]<br><br>   Defendant. | No. C06-4036-MWB<br><br>**REPORT AND RECOMMENDATION** |

## *I. INTRODUCTION*

The plaintiff Christine M. Brinkman ("Brinkman") appeals a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Brinkman claims the ALJ erred in improperly considering alcoholism as a material factor contributing to her disability; failing to develop the record fully and fairly, particularly regarding her intellectual functioning and mental impairments; and making erroneous findings concerning her physical and mental functional capacity.

## *II. PROCEDURAL AND FACTUAL BACKGROUND*

### *A. Procedural Background*

On October 19, 2001, Brinkman protectively filed applications for DI and SSI benefits, alleging a disability onset date of December 15, 1999. Brinkman's applications were denied initially and on reconsideration. On March 9, 2004, a hearing on the

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA"). On February 12, 2007, Michael J. Astrue became Commissioner of Social Security. He therefore is substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d)(1).

applications was held in Sioux City, Iowa, before ALJ Robert K. Rogers, Jr. Brinkman was represented at the hearing by Lee Sturgeon. Brinkman testified at the hearing, as did Nancy Ingalls, Brinkman's roommate and significant other, and Vocational Expert ("VE") Richard B. Ostrander, M.A. At the hearing, Brinkman amended her alleged disability onset date to June 1, 2003. (R. 345-46) On May 21, 2004, the ALJ ruled Brinkman was not disabled and not entitled to benefits. Brinkman appealed the ALJ's ruling, and on February 16, 2006, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.

Brinkman filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Brinkman's claim. Brinkman filed a brief supporting her claim on August 3, 2006. (Doc. No. 10) The Commissioner filed a responsive brief on September 12, 2006. (Doc. No. 11) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Brinkman's claim for benefits.

### *B. Factual Background*

### *1.   Introductory facts and Brinkman's hearing testimony*

Brinkman was born in 1956, and she was forty-seven years old at the time of the hearing. She is 5'7" tall and weighs about 230 pounds. She is divorced. She attended school to the eleventh grade, but did not finish. While in school, she was in special education. (R. 345, 349-50)

At the time of the ALJ hearing, Brinkman was working at a nursing home an average of twenty-four hours a week at $7.00 an hour. She testified she was unable to work longer hours because she would get too stressed. (R. 346, 349)

2

In the past, Brinkman has worked as a plant laborer, a maintenance worker, a security guard, a residential aide, and a waitress. She testified that she lost most of these jobs because of a personality disorder. She would adopt a bad attitude, and then get fired. She testified she is no longer able to perform any of these jobs full time. (R. 348)

Brinkman stated she has problems with her back and legs that limit her ability to lift heavy objects. She estimated she could lift ten pounds frequently and thirty pounds occasionally. (R. 351) After working on her feet for four or five hours, she is unable to stand because of sharp pains in her legs. She takes Tylenol for the pain. She testified that she would not be able to work at a job for more than four or five hours at a time even if she were permitted to alternate between sitting and standing. (R. 351-52)

On a typical day at home, Brinkman will sit and listen to the radio. She cooks supper and does some of the housework, like sweeping, vacuuming, and cleaning, but she testified she is "probably limited in some way" in the performance of these tasks. (R. 352-53) She drives, but "not very much." She drives to see her sister, her therapist, and to the grocery store. She does not belong to any clubs, groups, or organizations. (R. 360-61)

Brinkman has been getting mental health counseling since 1973. During the one-year period before the ALJ hearing, she saw a therapist once a month. Her mental problems cause her to have some good days and some bad days. On good days, she is able to read a book. On bad days, she goes into her bedroom and puts a blanket over her head for the entire day. She takes Effexor every day to try to help with the bad days. She has "flashbacks" four or five times a week, but not while at work. She stated she takes her medication right before she leaves for work, and the medication calms her down somewhat. (R. 353-55, 357-58, 362)

Brinkman estimated that in the nine months between her alleged disability onset date of June 1, 2003, and the date of the hearing on March 9, 2004, she had had an average of

3

twenty to twenty-five bad days out of every thirty days, although she had continued to go to work on both the good days and the bad days.

Even though Brinkman works only part time, she has problems getting along with her coworkers, and as a result, she has received three warnings and has been suspended once. (R. 356) As part of her job, she takes food to patients in the nursing home. She gets nervous when she has to serve a lot of people. (R. 359)

Brinkman testified that she had not used street drugs for twenty years, and she took her last drink of alcohol on December 9, 2002,[2] when she was arrested for driving while under the influence. (R. 346-47)

Nancy Ingalls testified that she has lived with Brinkman for nine years. She indicated that sometimes Brinkman "becomes very frustrated and she reverts back, she builds her walls, and she isolates, which is very dangerous for her. That's when she gets her suicidal tendencies and box and wrap[s] up in them." (R. 364) According to Ingalls, Brinkman has been hospitalized three times for suicidal behavior, the last time about five years earlier, and although she has improved since then, she sometime reverts back to suicidal thoughts. Ingalls testified that working three to four hours a day is a "real challenge" for Brinkman, and when Brinkman comes home from work, "she is so bound up and she's so nervous that I can see the stress and the tension to the point where it scares me." (R. 363-65)

---

[2]At the hearing, Brinkman testified she was arrested for driving under the influence on "December 9th last year." (R. 347.) The hearing was held March 9, 2004, which would suggest she was arrested on December 9, 2003. However, it is obvious from other evidence in the record that Brinkman misspoke, and the arrest was on December 9, 2002. Therefore, her last drink also would have been on December 9, 2002. (*See* R. 294, 333.)

4

## 2. *Brinkman's medical history*

As the Commissioner notes in her brief, most of the medical evidence in the record relates to the period before Brinkman's amended disability onset date. (*See* Doc. No. 11, p. 3) There is very little medical evidence for the period of time relevant to the present inquiry. Most of the consultants' reviews of the record occurred a year or more prior to Brinkman's amended alleged disability onset date of June 1, 2003. (*See* R. 108-21, 133-52, 163-81, 193-201)

For the period in question, the record contains treatment and progress notes from counselor Joann Martin, LISW, and her supervising psychiatrist Phillip J. Muller, D.O. Brinkman saw Dr. Muller and licensed therapists in his practice group on a regular basis for a period of several years. (*See* R. 268-330) From at least March 2003 forward, Brinkman consistently reported she was doing well and feeling good on her medications, which included Effexor and Risperdal. She wanted to seek employment. She worked with her therapist on personal issues arising as a result of Brinkman's recovery from alcohol addiction, including relationship issues, and issues surrounding past sexual abuse. She occasionally complained of mild anxiety and depression, but the majority of her problems appear to have arisen in connection with her relationships with her family and her significant other. Brinkman sought assistance in learning to be more assertive and developing coping skills to deal with anger and resentment. (*See* R. 273-87) At her last counseling session noted in the record, on August 18, 2003, Brinkman was noted to be "happy and upbeat today," with no new complaints. (R. 272) She saw Dr. Muller for a medication check on December 19, 2003, and reported that she had reduced her Effexor dosage to 150 mg per day, which she thought was what she had been told. The doctor increased the Effexor dosage back up to 375 mg per day, and continued Brinkman on Risperdal. (R. 269)

5

On January 13, 2004, Brinkman underwent a mental health evaluation by Denise Marandola, Ph.D., at the request of Disability Determination Services. The doctor found Brinkman "to be quite sincere in providing her information," and "quite credible," with "no indication of malingering." (R. 334) Dr. Marandola diagnosed Brinkman as having "Major Depressive Disorder, Recurrent; Agoraphobia without Panic Disorder; Alcohol Dependence, in Full Remission (by self-report); Rule-out Dissociative Identity Disorder." (*Id.*) She found Brinkman to have borderline intellectual functioning, with a lower Verbal IQ score, and some difficulty remembering and understanding instructions, procedures, and locations. (*Id.*) The doctor reached the following additional conclusions:

> As far as ability to carry out instructions, maintain attention/concentration and pace, Christina was very willing to follow instructions during this evaluation, but her cooperativeness apparently varies with mood and/or personality change. Her attention and concentration were good. Pace also appeared to be within the low average range as inferred from prior non-verbal IQ scores and current presentation.
>
> As far as ability to interact appropriately with supervisors, co-workers and the public, Christina was cooperative and pleasant in this interview; however, she apparently has a history of conflicts due to both aggressiveness and depressive affect in places of employment, that cause disruption in her relationships with supervisors, coworkers and the public. It appears that she would be at-risk of continuing a pattern of brief employment, of 4-5 months in duration, before difficulties arise.
>
> As far as ability to use good judgment and respond appropriately to changes in the work place, Christina has a history of poor judgment in repeated alcohol use and inappropriate interpersonal problem-solving.
>
> As far as ability [to] handle cash benefits, Christina cannot subtract and will likely need a payee, if she is to

6

>     receive benefits. She has requested that her significant other
>     be named her payee, if she does receive benefits.

(R. 335; *see* R. 336-37)

In Dr. Marandola's medical source statement of Brinkman's mental ability to perform work-related activities, the doctor indicated Brinkman would have marked difficulty in her ability to understand, remember, and carry out detailed instructions; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. She indicated Brinkman would have moderate difficulty in all other areas. (R. 336-37) The doctor noted that although Brinkman had been sober for over one year, alcohol abuse would exacerbate all of her other mental health issues. She further noted Brinkman's current level of mental functioning appeared to be "her best in several years." (R. 337)

On February 6, 2004, Brinkman's therapist, Joann Martin, LISW, completed a medical source statement regarding Brinkman's mental functional abilities in connection with the performance of unskilled work. She opined Brinkman would have little or no ability to remember work-like procedures, to complete a normal workday or workweek without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods. She opined Brinkman's ability to maintain attention for extended periods of two-hour segments would be good. She opined all other work-related mental functional abilities would be "fair." (R. 338-39) Ms. Martin further opined Brinkman has marked restriction of her activities of daily living and difficulties in maintaining social functioning, and she stated Brinkman has had repeated episodes of decompensation at work or in work-like settings. (R. 341)

### 3.     *Vocational expert's testimony*

The ALJ asked the VE to identify Brinkman's past relevant work by job title, numbers, and exertional level, but the ALJ did not ask the VE any hypothetical questions.

7

The VE identified Brinkman's past relevant work as waitress, housekeeper/cleaner, gate guard, store laborer, bakery worker/conveyor line, and residential aide. (R. 366-69)

Brinkman's attorney asked the VE the following hypothetical question:

> If a person of the same age as the claimant, the same vocational background and with that same past relevant work experience that you described to us just now, suffered from mental impairments that limited her according to her treating therapist as follows: that she would have a complete loss of any ability to complete a normal workday and workweek, without interruptions from psychologically based symptoms and performing [at] a consistent pace, would that individual be capable of performing either her past relative (sic) work or any other competitive employment?

(R. 369-70) The VE answered "No." (R. 370)

The attorney next asked the VE the following hypothetical question:

> If this same person with the same impairments has symptoms that would limit her and she would have complete loss of the ability to remember work-like procedures, and a substantial loss of the ability to understand and remember even short, simple instructions and to carry then [sic] out, would that individual be capable of either her past relevant work as you described it or any other competitive employment?

(*Id.*) The VE again answered "No." (*Id.*)

The attorney then asked the VE this final hypothetical question:

> If the individual, it's the same individual, suffered from mental impairments that result in depressive, and I'm reading from page two of what I think is Exhibit 16F [R. 339], ["]Christine suffers with depressive symptoms that at times cause her to be in bed for days. [She] becomes sad, isolates, has difficulty concentrating and cannot complete tasks as directed[."] [W]ould that individual be capable of performing either full-time past relevant work or any other competitive work?

(R. 370) The VE answered "No." (*Id.*)

## *4.  The ALJ's decision*

At the outset, the court notes the ALJ made a fundamental error in analyzing Brinkman's claims based on an alleged disability onset date of December 15, 1999. He neglected to note that at the hearing, Brinkman had, with the ALJ's consent, amended her alleged disability onset date to June 1, 2003, an action the ALJ noted "might eliminate some questions." (R. 345-55) The ALJ denied Brinkman's claims by relying primarily on evidence of alcohol abuse that applied only to the period before June 1, 2003.

The ALJ noted Brinkman previously had filed applications for DI and SSI benefits on October 29, 1986; April 14, 1988; July 29, 1991; April 19, 1996; March 9, 1998; and February 1, 2000; all of which were denied. Because Brinkman had not requested review of the denial of her February 1, 2000, applications, the ALJ found no basis to reopen the earlier applications, and considered only her October 19, 2001, applications for DI and SSI benefits. (R. 15-16)

The ALJ noted that in considering the issue of whether Brinkman is disabled, as defined in the regulations, the allegations in the record that Brinkman has abused alcohol raise "a further issue [of] whether the claimant has a medically determinable alcohol addiction disorder, and whether such a disorder is a material factor contributing to her disability." (R. 16) The ALJ pointed out that under the Social Security Act, a disabled individual is not eligible for benefits if substance addiction is a material factor contributing to the determination of disability. *Id.* (citation omitted).

At the first step of his analysis, the ALJ determined that Brinkman had last worked at substantial gainful activity on October 11, 2001, and she was not engaged in substantial gainful activity at the time of the hearing. (R. 17-18)

At the second step, the ALJ found Brinkman's claims of borderline intellectual functioning, depression, agoraphobia, and post-traumatic stress and dissociative identity disorders are not supported by the record. (R. 21) He found Brinkman's impairments of

9

hypertension, dysthymic disorder, personality disorder, and obesity are "non-severe" impairments. He further found Brinkman has the following severe impairments that would significantly limit her physical or mental abilities to do basic work activities: "degenerative joint disease of the knees, bilaterally; osteitis pubis; low back strain; and alcohol addiction disorder[.]" (R. 20; *see* R. 19-22) However, at the third step of his analysis, the ALJ found Brinkman's severe impairments, singly or in combination, do not meet the listing level of severity. (R. 20-22)

The ALJ specifically found "the medical evidence establishes that the claimant would not be disabled if she stopped abusing alcohol." (R. 16) He made the following findings, among others, regarding the relationship between Brinkman's mental impairments and her alcohol abuse:

> A review of the evidence confirms that the claimant has a history of periodic problems with alcohol abuse. Evidence indicates that she successfully completed treatment for chemical dependency in 1982 and was clean and sober for about 10 years. However, in early 1999 in the course of domestic problems, she was brought to the Marian Health Center in Sioux City on March 14, 1999 in an intoxicated state. She was discharged the following day after making a pledge to abstain from alcohol. Treating records from the Siouxland Mental Heath [sic] Center (SMHC) for the period January 12, 2000 through October 10, 2001 show that Ms. Brinkman has been diagnosed with a dysthymic disorder, a borderline personality disorder, and an alcohol abuse disorder in partial remission. By definition, a dysthymic disorder refers to a mood disorder characterized by depressed feeling and a loss of interest in one's usual activities, and in which the symptoms have persisted for more than two years, but are not severe enough to meet the criteria for major depression. A borderline personality disorder is characterized by a pervasive instability of mood and interpersonal relationships. The record shows that when she is complaint [sic] with medication and therapy, these impairments are stable and the claimant usually works at or above SGA levels.

10

However, when she starts drinking, she reports an increase in her dysthymic and borderline symptoms and often stops taking her medication altogether because she is afraid of an adverse reaction with her alcohol. She also tends to miss therapy appointments and days of work. Otherwise, the statements of the claimant and her roommate, Ms. Ingalls, indicate that she prepares simple meals and does the laundry and dishes, although she doesn't vacuum and Ms. Ingalls says the dishes are not frequently clean enough. Nevertheless, Ms. Brinkman drives daily and is able to shop independently, an activity that she enjoys. Additionally, treating records reflect that Ms. Brinkman assumes much of the responsibility for running the household while her roommate works. And, that even when she is working, she has been able to babysit her grandchildren for extended periods of time [citations to exhibits omitted].

Thus, absent alcohol abuse, I find her dysthymic and personality disorders impose[] no more than "mild" limitations on her activities of daily living, as evidence by her ability to do shopping, cooking, and some housekeeping activities, and drive on a daily basis; "mild" limitations on social functioning, as evidenced by her ability to maintain relationships with her roommate and people at work; and "mild" limitations on her ability to maintain concentration, persistence, and pace, as evidenced by her ability to complete necessary household chores, watch television and work when she is not drinking. She has never experienced repeated, extended episodes of deterioration or decompensation (3 episodes within 1 year, each lasting for at least 2 weeks), nor is there evidence that she requires a highly structured and supportive environment to function adequately. In addition, a minimal change in her environment would not be expected to result in decompensation or deterioration in her condition. Therefore, as these impairments do not impose any significant vocationally relevant limitations, they are thus considered to be "non-severe" impairments.

(R. 19-20)

In the fourth step of his analysis, the ALJ found that despite her back strain, osteitis pubis, and degenerative joint disease, Brinkman has the residual physical functional capacity to perform work at the medium exertional work activity level. (R. 26) With regard to Brinkman's mental health complaints, the ALJ found the testimony of Brinkman and her roommate not to be fully credible because, in the ALJ's estimation, "they have each been less than candid about Ms. Brinkman's alcohol abuse, especially since it was a precipitating factor in her 1999 hospitalization and it coincides with her subsequent exacerbations of depressive symptoms and on-the-job difficulties. " (R. 27)

The ALJ concluded that "<u>with alcohol abuse</u> Ms. Brinkman would be unable to perform sustained work at any exertional level, and would thus be considered 'disabled.' However, <u>without alcohol abuse</u> Ms. Brinkman would be able to perform a full range of medium work." (R. 27; emphasis by the ALJ) The ALJ also found, "The record as a whole does not reveal that the claimant is precluded from performing all regular, sustained work activity, when she is abstaining from alcohol." (R. 28). As a result, the ALJ found Brinkman was not disabled at any time through the date of his decision; i.e., May 21, 2004. (R. 32)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . .

12

in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the

13

presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the

14

claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### *B. The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less

15

than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord*

16

*Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;

17

|  | 4) | dosage, effectiveness and side effects of medication; |
|  | 5) | functional restrictions. |

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

As noted previously, the ALJ's opinion is fatally flawed because it is based on evidence of record that has no bearing on whether or not Brinkman was disabled from and after her alleged onset date of June 1, 2003. On this record, Brinkman has been sober since December 9, 2002. The ALJ completely failed to analyze Brinkman's allegations regarding her mental impairments for the relevant time period. Although the ALJ concluded that absent alcohol abuse, Brinkman is able to perform a full range of medium work, the court finds this conclusion not to be supported by substantial evidence of record. Indeed, the limited medical evidence since Brinkman's revised disability onset date suggests the opposite conclusion.

The undersigned rejects the Commissioner's attempt to evaluate the credibility of Brinkman's allegations based on an extrapolation from Brinkman's past medical history. The ALJ concludes that because Brinkman had lied to her treating medical practitioners in the past about her use of alcohol, she therefore might not be truthful now when she indicates she has been sober since June 1, 2003, and therefore, Dr. Muller's recent reliance on Brinkman's representations regarding her sobriety were misplaced. (*See* Doc. No. 11, pp. 22-23) Such speculation and innuendo are improper and cannot justify the ALJ's decision, which lacks appropriate evidentiary support in the record. *See, e.g.*, *Sorn v. Barnhart*, 178 Fed. Appx. 680, slip op. at 2 (9th Cir. 2006) ("Sheer speculation

18

unsupported by the record . . . [is] not a reasonable foundation for an adverse credibility finding."); *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) (ALJ who speculates that a treating physician was unduly swayed by a patient's subjective complaints deviates from the correct legal standard). *Cf. Vester v. Barnhart*, 416 F.3d 886, 894 (8th Cir. 2005) (Heaney, C.J., dissenting) (rejecting suggestion that "ALJ is free to speculate regarding the complex interaction of mental illness and substance abuse"). The court finds Brinkman was prejudiced by the ALJ's improper evaluation of the record evidence.

For these reasons, the undersigned finds this case should be remanded for further proceedings. Upon remand, the ALJ should be directed to base the disability determination on evidence of Brinkman's condition from and after her alleged disability onset date of June 1, 2003. The ALJ further should be directed to develop the record fully and fairly as required to issue an opinion regarding Brinkman's disability that is supported by substantial evidence. *See, e.g.*, *Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir. 1981) (ALJ has duty to develop record fully and fairly).

## V. CONCLUSION

Accordingly, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's

---

[3] Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed above.

**IT IS SO ORDERED.**

**DATED** this 9th day of May, 2007.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT